IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Kimberly M.,[1]                                                    No. 6:23-cv-00087-HZ

                Plaintiff,                    OPINION & ORDER

      v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

Katherine Eitenmiller
Mark A. Manning
Wells, Manning, Eitenmiller & Taylor, P.C.
474 Willamette St
Eugene, OR 97401

      Attorneys for Plaintiff

Kevin C. Danielson
U.S. Attorney's Office
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

John Drenning
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Kimberly M. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits ("DIB"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court reverses the Commissioner's decision and remands this case for an award of benefits.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB on December 3, 2020, alleging an onset date of January 1, 2013. Tr. 173.[2] Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2025. Tr. 19. Her application was denied initially and on reconsideration. Tr. 17.

      On January 25, 2022, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 17. At the hearing, she amended her alleged onset date to June 30, 2020. Tr. 17. On March 8, 2022, the ALJ found Plaintiff not disabled. Tr. 28. The Appeals Council denied review. Tr. 1.

## FACTUAL BACKGROUND

      Plaintiff alleges disability based on major depressive disorder, post-traumatic stress disorder ("PTSD"), and borderline personality disorder ("BPD"). Tr. 195. At the time of her amended alleged onset date, she was 58 years old. Tr. 26. She has at least a high school

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 8.

education and past relevant work experience as an equipment rental clerk, legal assistant, delivery driver, and mail clerk. Tr. 26.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work."

20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the Commissioner meets their burden and proves that the claimant can perform other work that exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity after her amended alleged onset date. Tr. 19. Next, at steps two and three, the ALJ determined that Plaintiff has the following severe impairments: "post-traumatic stress disorder (PTSD), major depressive disorder, borderline personality disorder, and generalized anxiety disorder." Tr. 20. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 21. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations:

> The claimant is limited to simple, routine tasks consistent with a reasoning level of 2 and unskilled work as defined by the Dictionary of Occupational Titles. The claimant is limited to goal-oriented work but is unable to perform at a production rate pace such as assembly line work. The claimant is limited to occasional interaction with coworkers but no teamwork or coordinated work and occasional interaction with the public but no interaction as an essential function of the job.

Tr. 22-23. Because of these limitations, the ALJ concluded that Plaintiff could not perform her past relevant work. Tr. 26. But at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as "Laundry

worker," "Janitor," and "Hand packager." Tr. 27. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 28.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) rejecting her subjective symptom testimony, and (2) finding the medical opinion of Kimel Limon, Psy.D, less than fully persuasive. Pl. Op. Br. 5, ECF 11. Plaintiff argues that the ALJ's decision is not supported by substantial evidence. *Id.* The Court concludes that the ALJ erred in rejecting Plaintiff's testimony and Dr. Limon's opinion, and that substantial evidence does not support the ALJ's decision. The Court also concludes that remand for an award of benefits is appropriate.

## I.    Subjective Symptom Testimony

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other grounds). First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Between 2006 and 2008, Plaintiff worked as a paralegal. Tr. 44. From 2010 to 2014, Plaintiff worked for U-Haul as an Area Field Manager. Tr. 45-46. From 2015 to 2017, Plaintiff worked for North Coast Electric delivering electrical parts. Tr. 46. Between 2017 and 2020,

Plaintiff worked in the mailroom of a community college. Tr. 39, 47. Plaintiff testified that she was fired from her jobs at the college and North Coast Electric, in the case of the latter due to her PTSD. Tr. 56. Plaintiff testified that she got a job after she was fired in 2020, but she worked only 8 to 10 hours per week. Tr. 56. She was fired from that job as well. Tr. 56. Plaintiff testified that at the college, "I had a real[l]y big breakdown" and "I was standing there, falling apart, in front of [her supervisor]." Tr. 66. She was fired from other jobs for similar reasons. Tr. 66. She testified that she would become "so full of anger and fear" that she could not function with people. Tr. 66-67.

Plaintiff testified that she had "been doing a lot of work on the land" of the property she lived on in exchange for the right to live at the property. Tr. 53-54. Plaintiff testified that back in June 2021 she had been doing an organizing business, "which has essentially died, now." Tr. 55. She helped people organize items in their home or business. Tr. 58. Plaintiff's friend referred her to other people, and Plaintiff "had a nice little work spell there. It didn't last that long." Tr. 55. She had three clients. Tr. 58. Plaintiff testified that the work "doesn't keep me afloat." Tr. 55. She hoped it would turn into something more, but it did not. Tr. 58.

Plaintiff testified that she did not think she could work because "I don't function well with people, anymore." Tr. 58. She did not like to go out in public. Tr. 58. She worked well with her previous therapist but was backtracking without a new therapist. Tr. 58. She found a new therapist "for a couple of months, and she just didn't work out well." Tr. 58-59. Plaintiff testified that if things did not go well, she would break down. Tr. 59. She testified that she broke down at her last three jobs and was fired because of it. Tr. 59. She testified that she did not have good coping skills and was trying to learn them in therapy. Tr. 59. She testified that her first therapist was surprised that Plaintiff had not committed suicide, and Plaintiff responded that she had tried

twice. Tr. 59. She testified that she kept herself going to raise her son as a single mother, but was now "very broken down, and I can't push myself anymore. I feel like I'm falling apart so badly." Tr. 59-60.

Plaintiff testified that she did not sleep well, and her providers tried to give her medication, but she was afraid to take pills. Tr. 60. She stated, "I can't get it past my brain to take medication" and wished that she could. Tr. 60. She was not taking any medication for her PTSD or other mental health conditions for the same reason. Tr. 60.

Plaintiff testified that she woke up early because of her poor sleep. Tr. 61. If she had to go somewhere, she would get up several hours before "and go over, in my head, what could go wrong, if I leave the house." Tr. 61. This process took her "a couple of hours." Tr. 61. She wrote in her function report that she could physically manage her personal care but did not always see the point if no one was around. Tr. 210. She liked to cook. Tr. 211. She could physically do chores but usually did not want to. Tr. 211. They could take ten minutes or several hours depending on her anxiety level. Tr. 211. She could handle money, but sometimes she shopped compulsively. Tr. 212.

Plaintiff testified that she drove about twice a week, either to the grocery store or a doctor's appointment. Tr. 49. She went alone because "I don't really have many people in my life." Tr. 49. She testified that she spent "[a]s little time as possible" in the grocery store because she did not do well in public. Tr. 50. She tried to put on headphones and get her shopping done within 30 minutes. Tr. 50. Plaintiff was on food stamps and tried to get whatever she could afford. Tr. 51. She made a grocery list and tried to stick to it. Tr. 52. She testified that she did not go out to eat. Tr. 52. She wrote in her function report, "I don't like to be around people very long as a panic attack comes on." Tr. 212.

Plaintiff testified that if she went to an appointment or the grocery store, she would have a panic attack about three times on the way there. Tr. 61. Sometimes she would turn around and come home. Tr. 61. She testified that she stayed home and cried a lot. Tr. 61. She would go online and try to look into new therapies for PTSD or natural remedies. Tr. 61. She testified that she just tried to make it through a day. Tr. 62. She could manage taking care of herself because she was alone. Tr. 62. She testified that attending her hearing "has made me shake like a leaf. I can't even function right now." Tr. 62. She testified that one time she yelled at a woman in the grocery store who got too close to her because she has a short fuse and reacts without thinking. Tr. 67. Driving was hard because of her anger. Tr. 70.

Plaintiff testified that she talked to her son on the phone "maybe once a month." Tr. 62. She had one friend in her life, the person who helped her try to do the organizing business. Tr. 68. She testified, "I don't have close friends because I am actually scared of hurting them, like I have done in the past." Tr. 68. She wrote in her function report that she had "a cat that I own who is my only companion." Tr. 210.

Plaintiff said that sometimes she would watch TV, but her reception was not good, and some programs bothered her emotions. Tr. 63. She did not read, and she only listened to music when she went to the grocery store and put on headphones to distract herself. Tr. 64. She stated that she was not interested in much other than researching coping strategies for her conditions. Tr. 64. She tried to practice mindfulness techniques that her therapist had taught her, "but then she left me." Tr. 64. Plaintiff testified that now she is "freefalling." Tr. 64.

Plaintiff testified that her memory was "not a good thing" and that she had trouble remembering events from three months ago because her "head doesn't do well with this PTSD." Tr. 53. She could not remember if she filed a tax return in 2021. Tr. 57. She could not remember

how long she had lived at her current residence. Tr. 69. She set reminders to take her vitamins. Tr. 211. She sometimes forgot to check her bank account balance. Tr. 212. She had trouble remembering verbal instructions. Tr. 214.

The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 23. The ALJ stated, "The medical evidence of record generally does not support the claimant's alleged loss of functioning." Tr. 24. The ALJ recognized Plaintiff's history of mental health impairments and their reported symptoms and treatment, and recognized that "she was not ready to stop counseling, was regressing in her progress, and was reporting emotional dysregulation several times a month if not daily, impacting her ability to work with others and relationships, and suicidal ideations." Tr. 24. The ALJ discounted Plaintiff's testimony based on her activities of daily living, the efficacy of therapy, and the results of mental status examinations. Tr. 24.

A.    Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). There are two grounds for using daily activities to support an adverse credibility determination: (1) when activities meet the threshold for transferable work skills, and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to

reach his or her conclusion on the claimant's credibility. *Id.* at 722-23. In addition, the claimant's ability to perform limited basic daily activities is not a clear and convincing reason to reject a claimant's testimony. *See id.* at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [her] credibility as to [her] overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation omitted).

The ALJ stated, "The claimant notes she is able to maintain personal care, prepare meals, do chores, drive, go out alone, handle money, shop in stores, and spend time with others[.]" Tr. 24. In relying on this evidence, the ALJ disregarded the context and manner in which Plaintiff reported she could do these activities. *See* Pl. Op. Br. 10. As discussed above, Plaintiff testified that she did not always see the point in performing personal care or doing chores. She testified that she had panic attacks before leaving the house and shopped as quickly as possible while wearing headphones. She testified that sometimes she had to turn around and go home, and sometimes she became angry enough that it was not safe for her to drive. Plaintiff testified that sometimes she forgot to check her bank balance. As for spending time with others, Plaintiff testified that she spoke to her son about once a month and was in occasional contact with one friend but that she did not have other friends because she worried about hurting them. The manner in which Plaintiff testified she could perform these activities was consistent with her other testimony about her symptoms. *See Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) (the manner in which claimant testified to performing daily activities was consistent with testimony about pain and was not a clear and convincing reason to discredit the pain testimony).

Defendant points to Plaintiff's attempt to start an organizing business in 2021. Def. Br. 6, ECF 13. But Plaintiff correctly states that there is no evidence that the ALJ relied on this activity in discounting her symptom testimony. Pl. Reply 5, ECF 14; Tr. 24. In any event, Plaintiff testified that she only had three clients and then the business fizzled. Tr. 55, 58. In the therapy note the ALJ mentioned at the hearing, Plaintiff told her therapist that she was "taking on more jobs than she can handle." Tr. 515. The record shows that Plaintiff made a brief, unsuccessful attempt to work and became overwhelmed with only three clients, and the business died out. The record also shows that Plaintiff was low-income, as she was on food stamps. Tr. 51. The Ninth Circuit has held that where a claimant briefly attempts to work after the alleged onset date due to economic difficulties, and fails because of their impairments, the work attempt is not a clear and convincing reason to discount the claimant's symptom testimony. *Lingenfelter*, 504 F.3d at 1036-37. In sum, Plaintiff's activities are not a valid basis to discount her testimony about her mental health limitations.

B.    Effectiveness of Therapy

Relevant factors for the ALJ to consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness, and side effects of any medication" the plaintiff takes to alleviate symptoms, as well as treatment besides medication that relieves symptoms, and other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(vi). "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual improvement in his functioning with prescribed medication and psychotherapy sessions").

The ALJ stated that Plaintiff "reported she wanted to work on her anger and recognize triggers of same, and was utilizing coping and mindfulness skills to control her anger, noting that therapy was effective[.]" Tr. 24 (citing Tr. 379-381, 424, 468, 500, 510-512, 514, 583-584, 756, 758). The ALJ was correct that Plaintiff expressed a desire to improve her coping skills through therapy and reported on a few occasions that she had successfully used her coping and mindfulness skills, but he overstated the extent of her progress. In the same treatment notes on which the ALJ relied, Plaintiff reported that she continued to struggle with anxiety, anger, and outbursts. For example, in February 2021, Plaintiff told her therapist that some of the skills she had learned helped her manage her anxiety but did not solve the problem. Tr. 500. She reported ongoing struggles with anger toward others. Tr. 500. In April 2021, Plaintiff reported anxiety about her living situation and stated that her anger impulses "become amplified by her anxiety." Tr. 510.

The overall progress trackers and goals set by Plaintiff's therapists demonstrate that Plaintiff's symptoms only minimally improved at best. A May 2020 review of her treatment plan listed several problems and goals. Tr. 385-386. Plaintiff reported "experiencing severe emotional dysregulation several times a month, if not daily," which impacted her ability to interact and work with others, as well as suicidal ideation without intent or plan. Tr. 386. The relevant goals were to be able to manage and cope with emotions and understand triggers, significantly reducing emotional outbursts, and building healthier relationships; and learn skills through group therapy. Tr. 386. Plaintiff also reported a long history of trauma, which caused "extremely high anxiety that prevents her from leaving the house at times and prevents her from enjoying being around others" as well as "not being able to manage anger and irritability outbursts effectively."

Tr. 386. Goals included eliminating some PTSD symptoms and triggers and reducing anxiety levels. Tr. 386.

At an annual update in December 2020, Plaintiff reported that her PTSD was worsening. Tr. 457. She reported jumpiness, nightmares, and hypervigilance. Tr. 457. She reported that her anxiety and anger continued to be a problem. Tr. 457. She reported ongoing passive suicidal ideation. Tr. 457. Her therapist noted that Plaintiff "often reports dreaming about running away to a new place." Tr. 457. Her mood was recorded as significantly depressed. Tr. 457. In January 2021, Plaintiff's treatment plan reflected that all of the concerns and goals listed above from the May 2020 review were still active except for completing the course of group therapy sessions to learn coping skills. Tr. 387-388. In September 2021, Plaintiff's therapist completed a termination report because the therapist was leaving the provider. Tr. 580. The therapist wrote that Plaintiff "made some progress toward her goals but often struggled with back slides and black and white thought patterns." Tr. 580. Plaintiff started seeing a new therapist, who recorded the goal that Plaintiff would have "[n]o more than 2 outbursts per week." Tr. 754. In November 2021, Plaintiff told her new therapist that "anger is her first emotional response." Tr. 762.

The record as a whole does not support the ALJ's conclusion that Plaintiff could control her anger to the degree that she could work full-time. While Plaintiff at times reported that she had used mindfulness and coping techniques to avoid angry confrontations, she reported ongoing issues in interacting with others. In late 2021, her therapist set a goal of having no more than two outbursts per week. Tr. 754. And the record does not show sustained improvement in Plaintiff's anxiety and depression. Finally, the therapy records do not undermine Plaintiff's testimony that she had a helpful therapist but then began backsliding after that therapist left. Even when

Plaintiff was working with an effective therapist, her progress was slow and inconsistent. The efficacy of therapy is not a basis to discount Plaintiff's symptom testimony.

      C.     Objective Medical Evidence

An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022).

The ALJ discounted Plaintiff's testimony about her symptoms based on the results of mental status exams. He wrote that Plaintiff "was commended for her insight" and that "mental status examinations noted normal mood, affect, thought content, judgment, and behavior, intact memory, attention, concentration, persistence, and abstract reasoning, goal-directed thinking, intact thought process, normal speech, good eye contact, fair insight, and adequate social judgment, with no current suicidal ideations, homicidal ideations, hallucinations, or delusions."

Tr. 24 (citing Tr. 425, 468, 470-471, 755, 769, 775). Defendant points to additional treatment

notes showing normal mental status exams. Def. Br. 4. Most of these exams are brief and were

performed by providers who were addressing Plaintiff's physical health complaints. *E.g.*, Tr.

275.

    With respect to Plaintiff's insight, in July 2020, Plaintiff told her therapist that she

thought that at a certain point, people could no longer blame their parents for their problems. Tr.

425. Her therapist commended Plaintiff for this insight. Tr. 425. Plaintiff's ability to identify the

sources of her trauma or desire to better manage her trauma does not serve to discount her

testimony about the symptoms of that trauma. Plaintiff testified that she was very motivated to

find new techniques to manage her mental health conditions. Tr. 61. Despite this motivation and

years of therapy, Plaintiff also testified that her symptoms were ongoing. There is no

contradiction between Plaintiff's insight and her testimony.

    As for the mental status exams, some of the findings are irrelevant to Plaintiff's

testimony. Plaintiff never testified that she had hallucinations, delusions, or homicidal ideation.

Next, although the ALJ pointed to a few times when Plaintiff denied suicidal ideation, he also

recognized that Plaintiff reported suicidal ideation. Tr. 24. Plaintiff repeatedly reported passive

suicidal ideation. Tr. 386, 458, 468. The ALJ's reliance on the times when she denied suicidal

ideation was error. The record as a whole does not support a finding that this issue was resolved.

    To the extent the other mental status exam findings merely fail to support Plaintiff's

testimony, they cannot serve as a valid basis to discount her testimony because the ALJ

identified no other valid basis to discount Plaintiff's testimony. The normal findings relating to

mood and behavior do not support her testimony, but they do not contradict it because she

testified that her angry outbursts happened at unpredictable times, not every single time she went

out. Furthermore, Plaintiff's therapist noted in December 2019 that Plaintiff's "affect was incongruent with her mood as she often jokes and laughs when she is feeling vulnerable." Tr. 410. This further undermines the validity of the mental status exams as to Plaintiff's mood and affect, particularly when they were performed by providers who either were focused on treating Plaintiff for physical ailments or did not treat her regularly.

To the extent that the mental status findings contradict Plaintiff's testimony about her memory and concentration, or even her mood, this evidence on its own does not constitute substantial evidence. First, many of the mental status exams Defendant points to do not address Plaintiff's memory and concentration, only her orientation to person, place, and time. *E.g.*, Tr. 291. Plaintiff did not testify to becoming disoriented. Second, the ALJ recognized Plaintiff's history of mental health impairments, ongoing need for counseling, and regression of her progress. Tr. 24. As discussed above, Plaintiff's activities and therapy records are consistent with her testimony. While mental status exams continue to be one basis on which ALJs may properly discount evidence, they are sufficient under different circumstances. *See, e.g.*, *Woods v. Kijakazi*, 32 F.4th 785, 793 (9th Cir. 2022) (substantial evidence supported ALJ's discounting of medical opinion that claimant had marked and extreme limitations in memory and concentration where mental status exams showed normal memory and concentration, and therapy notes did not mention any limitations in concentration or memory). Here, unlike in *Woods*, the ALJ recognized that Plaintiff's therapy records supported her testimony. Tr. 24. The mental status exams alone are insufficient to sustain the ALJ's decision.

Defendant also points to findings that Plaintiff was in no acute distress. Def. Br. 4. Defendant relies on *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). The ALJ did not rely on findings that Plaintiff was in no acute distress. Tr. 24. And Plaintiff correctly points out

that *Rollins* involved physical limitations unsupported by any findings made by any doctor. Pl.

Reply 4. Plaintiff does not allege disability based on physical impairments, and all of her mental

limitations have at least some support in the medical record.

In sum, the ALJ erred in rejecting Plaintiff's symptom testimony. Plaintiff's activities and

the effects of therapy do not undermine her testimony. To the extent the mental status exams

only fail to support her testimony, they are legally insufficient on their own to discount

Plaintiff's testimony. To the extent they contradict her testimony, they do not on their own

constitute substantial evidence supporting the ALJ's decision.

## II.    Medical Opinion Evidence

For claims filed on or after March 27, 2017, ALJs are no longer required to give

deference to any medical opinion, including treating source opinions. Rules Regarding the

Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20

C.F.R. §§ 404.1520c, 416.920c. Instead, the agency considers several factors. 20 C.F.R. §§

404.1520c(a), 416.920c(a). These are: supportability, consistency, relationship to the claimant,

specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The

"most important" factors in the evaluation process are supportability and consistency. 20 C.F.R.

§§ 404.1520c(b)(2), 416.920c(b)(2).

Under this framework, the ALJ must "articulate . . . how persuasive [they] find all of the

medical opinions" from each doctor or other source. 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2).

In doing so, the ALJ is required to explain how supportability and consistency were considered

and may explain how the other factors were considered. 20 C.F.R §§ 404.1520c(b)(2),

416.920c(b)(2). When two or more medical opinions or prior administrative findings "about the

same issue are both equally well-supported . . . and consistent with the record . . . but are not

exactly the same," the ALJ is required to explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods*, 32 F.4th at 792.

On February 21, 2021, Dr. Limon performed a comprehensive psychodiagnostic examination of Plaintiff. Tr. 467-473. Dr. Limon reviewed Plaintiff's trauma history, including being raped at knifepoint and being in a major earthquake in a glass building that shattered. Tr. 467. Plaintiff reported that she would move whenever she became overwhelmed. Tr. 468. She reported that she did not sleep and had nightmares. Tr. 468. She was triggered by low rumbling noises because they reminded her of the earthquake. Tr. 468. She did not trust people and could not be left alone with a man. Tr. 468. She had persistent feelings of anger, horror, and shame; she also stated that she felt irritable, was hypervigilant, and had exaggerated startle responses, trouble concentrating, and sleep disturbances. Tr. 468. Plaintiff reported that she went to counseling and it helped her manage her emotions. Tr. 468. She denied current suicidal ideation but reported that she experienced passive suicidal ideation during periods of emotional dysregulation. Tr. 468. She attempted suicide five times in the past. Tr. 468.

Plaintiff told Dr. Limon that she could take care of personal hygiene except when she had a breakdown. Tr. 470. She could travel independently, take care of her household, and manage money. Tr. 470. She reported having one friend and said that she avoided social events and tended to isolate. Tr. 470. She could shop independently but had difficulty being around people. Tr. 470.

Dr. Limon performed a mental status examination of Plaintiff, finding her fairly-groomed and cooperative, with good eye contact. Tr. 470. Plaintiff's speech was spontaneous and her

thought process was intact. Tr. 470. Her thought content was appropriate to the situation, and she

could sustain goal-directed thinking. Tr. 470. Plaintiff described her mood as detached, and she

appeared anxious to Dr. Limon. Tr. 471. Her affect was "characterized with a full range of

emotion." Tr. 471. She was oriented to all spheres. Tr. 471.

Plaintiff performed well on a memory test. Tr. 471. She had immediate recall of three

unrelated words, recent recall (after five minutes) of three unrelated words, and could state her

date of birth and Social Security Number. Tr. 471. Her fund of knowledge of basic information

such as the name of the President was intact. Tr. 471. Her ability to perform calculations was

moderately impaired. Tr. 471. Her concentration was within normal limits; she could spell the

word "money" backwards. Tr. 471. Her abstract thinking and reasoning were intact; she could

state that an apple and banana were both fruit. Tr. 471. Her social judgment was adequate; she

stated if she was the first person in a movie theater to smell smoke or see fire, she would run. Tr.

471. She had fair insight into her mental status and need for treatment. Tr. 471.

Dr. Limon found Plaintiff credible in her statements. Tr. 472. Plaintiff's prognosis was

poor. Tr. 472. Dr. Limon concluded that Plaintiff could manage her own finances. Tr. 472.

According to Dr. Limon, Plaintiff had a moderate limitation in remembering and carrying out

simple and complex tasks and a moderate limitation in her ability to sustain concentration and

attention and persist at a reasonable pace. Tr. 472-473. Dr. Limon opined that Plaintiff had an

extreme limitation in her ability to maintain effective social interaction on a consistent and

independent basis with supervisors, coworkers, and the public. Tr. 473. Dr. Limon pointed to

Plaintiff's history of being terminated from employment for not getting along with coworkers

and supervisors, her relative isolation and dislike of being around others, and her extreme

nervousness during the interview. Tr. 473. Finally, Dr. Limon stated that Plaintiff had a marked

impairment in her adaptive functioning, and she required reminders and assistance. Tr. 473. Dr. Limon relied on Plaintiff's testimony that when she has a breakdown, she remains in bed for three days. Tr. 473.

The ALJ found Dr. Limon's opinion somewhat persuasive. Tr. 25. The ALJ stated that the opinion was "only somewhat consistent with the examination of the claimant, which noted abnormal mood and affect and moderately impaired calculations, supportive of some limitation in interacting with others and maintaining attention and concentration." Tr. 25. The ALJ stated that "the full examination noted no other abnormal findings, and thus does not support such severe limitations in remembering and carrying out tasks, sustaining attention, concentration, and pace, interacting with others, or adapting." Tr. 25. The ALJ recognized Plaintiff's trauma history and reported symptoms, but stated that based on "generally normal mental status examination findings," the record was "more consistent with moderate limitations in each functional area, with a limitation to simple, routine tasks not at production rate pace with occasional interaction with others." Tr. 25. Thus, the ALJ only rejected Dr. Limon's opinion on the degree of limitation for interacting with others and adaptive functioning.

Plaintiff argues that the ALJ erred in rejecting the degree of social and adaptive limitation assessed based on the mental status exams because Dr. Limon relied on the clinical interview, which is also an objective measure. Pl. Op. Br. 14. Plaintiff is correct. The Ninth Circuit has explained that a clinical interview by a psychologist is an objective measure that "cannot be discounted as a 'self-report.'" *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). Dr. Limon found Plaintiff credible in her self-report and then relied on Plaintiff's history of being fired based on her behavior, her demeanor at the interview, and her self-reported isolation and dislike of being around others to find an extreme limitation in Plaintiff's ability to interact with others.

The ALJ discounted the degree of social limitation assessed based on other normal findings in Dr. Limon's mental status exam as well as other mental status exams showing mostly normal results. Tr. 25. This was error. As the ALJ noted, Dr. Limon found an abnormal mood and affect. Tr. 25. Dr. Limon's findings that Plaintiff could make eye contact and cooperate despite her nervousness cannot reasonably weigh heavily against the other abnormal findings and the clinical interview, which is also an objective measure. Nor was it reasonable to conclude that brief, cursory mental status exams by physicians who do not specialize in mental health and who were treating Plaintiff for physical ailments undercut Dr. Limon's assessment to such a degree.

As for the limitation in Plaintiff's adaptive functioning, Dr. Limon properly relied on Plaintiff's testimony during the clinical interview, which is an objective measure. Plaintiff told Dr. Limon that she could take care of personal grooming and chores on her own, but if she had a breakdown, she would not do so. Tr. 470. She also told Dr. Limon that "she has not been able to stay in one area for a long period and will move when she becomes overwhelmed and refers to this as 'fleeing.'" Tr. 472. The ALJ rejected Dr. Limon's assessment of a marked limitation based on "generally normal mental status examination findings." Tr. 25. In finding that Plaintiff had only a moderate limitation in her adaptive functioning, he noted that Plaintiff had fair insight and normal judgment, and was commended on her insight during treatment. Tr. 22.

The mental status examinations alone are an inadequate basis to discount Dr. Limon's opinion about Plaintiff limitation in adaptive functioning. The record shows that Plaintiff was aware of her mental health challenges, including her angry impulses and urge to flee, but she struggled to control these impulses. Many of the mental status exams Defendant points to do not even address Plaintiff's insight or judgment. *E.g.*, Tr. 291. And Dr. Limon's assessment was supported by the results of the clinical interview and consistent with Plaintiff's therapy records.

Plaintiff also reported to her therapist that she became easily overwhelmed and that she felt the urge to move to new places when she felt she was in danger. Tr. 385 (May 2020 review of treatment plan), 423 (June 2020 statement that she felt an ongoing impulse to move to another city and pretend to be another person), 424 (July 2020 report that urge to leave town was ongoing).

Defendant points to the findings of Joshua Boyd, Psy.D., which the ALJ found mostly persuasive. Def. Br. 10. In concluding that Plaintiff had moderate limitations in her social interaction and adaptive functioning, Dr. Boyd relied on generally normal mental status exams. Tr. 85. The ALJ relied on the same in finding Dr. Boyd's opinion mostly persuasive. Tr. 24-25. For the reasons explained above, the mental status exams are not an adequate basis to discount Dr. Limon's opinion.

In sum, the ALJ erred in discounting Dr. Limon's opinion about Plaintiff's limitations in social interaction and adaptive functioning. The mental status exams are insufficient to support his analysis. If Dr. Limon's opinion is credited, it indicates that Plaintiff might meet or equal a listed impairment under the Paragraph B criteria. The Court need not determine whether the ALJ should have found that Plaintiff met or equaled a listed impairment under the Paragraph B criteria because, as discussed below, other evidence in the record that has been fully addressed compels the conclusion that Plaintiff is disabled.

## III.    Substantial Evidence

Plaintiff asserts that substantial evidence does not support the ALJ's decision. Pl. Op. Br. 15. In support, Plaintiff points to a later-submitted medical opinion from Connie Burnett, LPC, who treated Plaintiff for her anxiety. *Id.* (citing Tr. 13). In a letter, Ms. Burnett opined that Plaintiff could not work due to symptoms of her anxiety, including excessive, uncontrollable

worry; edginess or restlessness; tiring easily; impaired concentration; irritability; increased muscle aches or soreness; difficulty sleeping; and panic attacks when going to public places. Tr. 13. Defendant counters that the letter postdates the ALJ's decision, discusses symptoms the ALJ addressed in his decision, and is not a medical opinion under the regulations because it does not include specific limitations that could be incorporated into an RFC assessment. Def. Br. 14. The Court concludes that it is not necessary to address Ms. Burnett's letter because even if it is disregarded, the ALJ's decision is not supported by substantial evidence.

The ALJ erred in discounting Plaintiff's symptom testimony and Dr. Limon's opinion. Substantial evidence does not support the ALJ's assessment of Plaintiff's limitations. In particular, substantial evidence does not support the degree of social limitation the ALJ assessed. The ALJ repeatedly relied on Plaintiff's testimony that she had been fired from multiple jobs due to her interactions with coworkers or supervisors, as well as her testimony that she had angry outbursts. Tr. 21, 22, 23. The RFC contained no limitations accommodating this testimony, which was erroneously rejected. As discussed below, the Court concludes that this testimony should be credited as true and that it compels a finding that Plaintiff is disabled.

**IV.    Remand for Benefits**

Plaintiff asks the Court to credit the improperly rejected evidence as true and remand for an award of benefits. Pl. Op. Br. 16; Pl. Reply 6-8. Defendant argues that any remand should be for further proceedings. Def. Br. 14-15. The Court concludes that remand for an award of benefits is proper.

To determine whether it is appropriate to remand for payment of benefits or for further proceedings, the Ninth Circuit uses a three-part test. *Garrison*, 759 F.3d at 1020; *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014). First, the ALJ must fail to

provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed, and further administrative proceedings would serve no useful purpose. *Id.* Third, if the Court remands the case and credits the improperly discredited evidence as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part of the test must be satisfied. *Id.* The "ordinary remand rule" is "the proper course," except in rare circumstances. *Treichler*, 775 F.3d at 1099-100. In deciding whether to remand for further proceedings or payment of benefits, the district court should consider whether the claimant's testimony was inconsistent with the medical evidence, or whether the government has pointed to evidence that the ALJ overlooked. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015).

The first requirement is met. The ALJ failed to give legally sufficient reasons to reject Plaintiff's testimony.[3] The second requirement is also met, as the record is fully developed. As to the third requirement, the ALJ failed to identify valid reasons to discount Plaintiff's testimony that she often becomes angry and sometimes has angry outbursts directed at coworkers or individuals in public. The ALJ recognized that Plaintiff had been fired based on her interactions with coworkers and supervisors. Tr. 21, 22, 23. At the hearing, the VE testified that if an individual had "rare instances of verbal outbursts with coworkers or supervisors in the work setting," that person "would not be employable" because "employers simply do not tolerate this." Tr. 78. The VE also testified that no jobs would be available in the national economy if Plaintiff were limited to no interaction with coworkers. Tr. 77. If the Court credits as true Plaintiff's testimony about her outbursts, the ALJ would be required to find that Plaintiff is disabled. The record on that issue is fully developed.

---

[3] The Court performs the analysis as to Plaintiff's testimony only because it is dispositive.

In arguing against a remand for an award of benefits, Defendant argues that "the record leaves serious doubt Plaintiff was disabled." Def. Br. 15. Defendant states, "Plaintiff does not even challenge the ALJ's assessment of the medical opinion of Joshua J. Boyd, Psy.D., which supported a conclusion that Plaintiff's impairments were not disabling." *Id.* Plaintiff counters that this opinion on its own does not constitute substantial evidence that justifies the rejection of another doctor's opinion. Pl. Reply 8. Plaintiff also argues that Defendant did not point to anything the ALJ overlooked. *Id.* The Court agrees with Plaintiff's second argument. In arguing that the ALJ erred in rejecting Dr. Limon's opinion, Plaintiff effectively challenged the ALJ's agreement with Dr. Boyd to the extent his opinion differed from Dr. Limon's opinion. In finding that Plaintiff had moderate limitations in the four areas of functioning, Dr. Boyd relied on evidence that the ALJ addressed in his decision, the parties addressed in their briefs, and the Court addressed above. In particular, the ALJ noted Dr. Boyd's reliance on unremarkable mental status examination findings. Tr. 24-25. No further discussion of that evidence is necessary. Because further administrative proceedings would serve no purpose, the Court remands this case for an award of benefits.

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED for immediate payment of benefits.

IT IS SO ORDERED.

DATED:  January 12, 2024  .

MARCO A. HERNANDEZ
United States District Judge